Good morning and welcome to the Ninth Circuit. We are joined today by our colleague, Judge Mylon Smith, who is participating by Zoom. We are here to hear oral argument in the case of NetChoice v. Bonta. The parties have two minutes aside. Judge Smith, can you hear me? I can. And counsel, if you could just say something. I just want to make sure Judge Smith can hear you as well. Good morning, Judge Smith. Good morning. I can hear you as well. Thank you. Super. So, counsel, whenever you're ready. Good morning, Your Honor. Kristen Liska on behalf of the state of California here. May it please the court. And I would like to reserve five minutes of my time for rebuttal. I'll keep an eye on the clock. The California legislature passed the age appropriate design code act to protect the privacy and safety of children online. Indeed, the enacting legislation expressly states that the legislature's intent in passing the law was to promote privacy protections for children. Such concerns for children's privacy and safety online are not unfounded. According to one estimate, advertising technology companies collect an average of 72 million data points about a child by age 13. As the record established below demonstrates, online companies use and collection of data poses real risks of harm to children's privacy and safety. To effectuate its purpose of protecting children, the act solely regulates those online services, products or features that are likely to be accessed by children. The statute defines likely to be accessed by children to mean that it is reasonable to expect based on a list of indicators that children would access the online service product or feature. Counsel, since you want to since you're focusing on those indicators, I want to start off by getting my understanding of the state's view on something. As you know, CADCA's coverage definition refers to six separate indicators whether or not the online service is likely to be accessed by children. In your view, should the district court have assessed each indicator separately? I think with respect to the fact that this is a facial challenge, if we're looking at this in a facial way, I think that the question would be every application which would require looking at each particular provision. To the extent that there's a problem with one specific one, that's more of an as applied type of challenge, I would think. And so that would be the nature of how to look at this in that context. What I'm concerned about is this. The as I look at it, the indicators, some are content-based, some are neutral. So how should we treat the district court's injunction as to the entire CADCA on the basis of a gateway coverage definition? So I think that the way to look at the lower court's decision, it does sort of turn on if we're talking about the threshold First Amendment stepped of does this regulate speech? Does it trigger First Amendment scrutiny? Versus the subsidiary step which is the content-based, content-neutral step. If we're looking to the first indicator and we're doing the facial analysis that Moody laid out, the question would be what are the different applications of this provision? And several of those applications will turn or a business would be subject to the statute for reasons that have nothing to do with their expressive activity. And the statute as applied on the whole does not regulate speech or signal out specifically expressive actors for regulation, given the different features involved. Because I do not understand plaintiffs. If I understand correctly, you're saying as far as the state is concerned, it doesn't bother you that arguably some of these indicators are content-based where others are content-neutral? I think if plaintiffs wanted to challenge a specific prong, if they were to say this one aspect of this statute definition and enjoin just that one, we might focus analysis on a specific indicator. But plaintiffs are seeking to enjoin the full statute based on the entire definitional provision. That's my understanding of their argument. I'm sure my friend on the other side can weigh in on that. And if the goal is to enjoin the full definitional provision and the full statute, you would need to look at the whole aspects of what everything is doing rather than focus on one indicator. So counsel, let me follow up on Judge Smith's question because I want to make sure I understand the state's position. Is the state's position with regard to the six, A through F, is it that none of them regulate speech and that all are just content and that there is no First Amendment aspects essentially to any of them? Or is the state's position, well, they didn't make that argument so we really don't have a specific answer to that question or something else? So our position is that this definition as a whole, the whole definition of likely to be accessed by children, neither regulate speech itself, the definitional provision as distinct from the rest of the statute, and that the whole definitional provision, all of the different indicators looked at together, do not signal out those in expressive activity, so it does not trigger First Amendment scrutiny. That would be distinct from asking if one indicator did, and the fact that one indicator did might be an argument that would suggest a proper injunction of that specific indicator, but that's not what the lower court did below, and that's where we think the error lies. And that's not what you take the plaintiffs to be arguing here. That's correct. For them, as it's framed, their facial challenge rises or falls on 31A, the overall piece. They haven't framed this, framed any challenge around the coverage indicators specifically, and so if we're forced to answer the question of whether the top line, likely to be accessed by children, is facially unconstitutional because it's content-based, our answer to that has to be no. That would be our understanding, correct. They have not asked this court to enjoin, say specifically, indicator E, which is the design element one. They've asked this court to enjoin, or they've asked the lower court in the lower court's decision, enjoin the entire statute as a whole and the entire definitional provision as a whole, which we would say under Moody, especially in a facial challenge, necessitates looking at all of the pieces together and the entire definitional provision in its totality and asking at that threshold, does it regulate speech or signal out? But you can see that a facial challenge could lie against any of the particular coverage indicators if that's how plaintiffs wanted to frame it. I think that plaintiffs could bring a facial challenge specifically to one indicator if that's how they had wanted to frame it. And then how does it work? And again, I take it that the district court didn't reach this because the plaintiffs didn't frame it this way, but if in the next steps in this case, once we get past the preliminary steps, they wanted to proceed on this, would we then look at, and this is even before we get to the Moody questions, but we then look at each coverage indicator, so we'd look at, so if we had a concern that, say, E were content-based or a concern that C did not meet intermediate scrutiny for commercial speech or might have some applications, we would then have to look at, for example, all, all of the individual all of the substantive regulations of it that would fall under E? So I would think that the way the Moody analysis would go, if they had followed through with this, would be to ask all of the applications of the definitional provision, how does that apply? I think the question is, what are they seeking to enjoin? If they're seeking to enjoin the entire substantive statute, then yes. I think with respect to performing a tailoring analysis, you know, this court's decision in the other Net Choice case, the SB 976 case, and the way Moody does this analysis, is that plaintiffs need to put forth a factual record so that this court can determine every application of the statute and whether or not those applications are constitutional or not. So if they were to enjoin the substantive regulations, this court would need to drill into, how do those substantive regulations apply to who do they apply and which of those applications meet the proper tailoring level. But I guess coming at it then from the other end, there's the data use and dark patterns requirements ran into trouble on vagueness grounds. That's not a First Amendment challenge that would require us to sort out the Moody question. So from the bottom up, again, if we look at, assume E is what we're trying to analyze for First Amendment purposes, and for a facial challenge, we have to do the Moody analysis of what its application is, what do we do with the fact if we, with a vagueness challenge to the underlying requirements that would be applied for uses that fall within coverage indicator E? I think that the question is what specifically plaintiffs are seeking to enjoin. So I think that if we had a situation of we want to enjoin specifically E, we don't want the state to enforce indicator E, then this court would be asking questions about how does E apply, how does it meet intermediate scrutiny, the tailoring, the strict scrutiny, whatever the level is. If the question is we want to enjoin the data use provision because that provision is vague, the question is the language of that provision itself vague. So I think we need to look to what it is that they wish to enjoin and ask how that particular provision meets the necessary test that is applied to it. Could you speak to the, so we're now a ways ahead of where the plaintiffs brought the district court and what we're faced with even after remand, so maybe we should then, I guess I'd like to hear your take on the vagueness questions around the data use and dark patterns requirement because I take it if the vagueness challenges to those parts succeed, there's not a whole lot left to apply under any coverage indicator in the Act. If the vagueness is specifically to those provisions. Right, it is, is it not to the district court not hold those vagues? Yes, just specifically to the data use provisions themselves, yes. I mean but that would be an argument that would justify enjoining those specific provisions and I think it is worthwhile to also keep in mind there are about 14 substantive provisions in this statute and plaintiffs individually challenge only about half of those. So to the extent that there may be, you know, this court may agree that the vagueness issues apply to those specific provisions. We've taken the report piece off the first time around and a lot of those other provisions are voluntary, so I guess why shouldn't we then, setting aside the First Amendment challenges, why shouldn't we affirm on the vagueness challenges to the data seat use requirements? So we would argue that those provisions are not vague. As we discussed, I think plaintiff focuses on, it may be helpful to sort of break them apart into two groups. There's the first data use provision, which involves the material detriment to a child, material harm to a child language. The other three data use provisions and the dark pattern specifically involve the best interest of the child language and I think it's important to consider the vagueness of those separate phrases separately. So we think that it's clear with respect to materially detrimental to a child's well-being, that has a clear understanding of what those language means and the cases talk about how the fact that applying a standard may involve some degree of discretion or reasonable minds may differ, does not make the standard itself vague. Where does that language come from? So we cite to some of those cases in our brief. What would a California court applying this or a federal court trying to apply California law to this, where would we look to try to, that entire phrase to try to sort out what that would mean? Yeah, so as we walk through in our opening brief, I don't have those exact pages in front of me, but I know we go through this analysis. The California courts first look to what the plain meaning of language is and the plain meaning of material detriment to a child's well-being would be something that causes a more than de minimis level of harm to a child. And I think that that's what it means for something to be materially detrimental has a clear plain language meaning. It may be difficult to determine on the margins whether or not a particular thing is materially detrimental, but I think there is a clear understanding of what it means that something is. And that's really what vagueness focus is on. I mean, this is the language coming from Johnson versus United States. We cite it through, I think a DC circuit case on page 18 of our reply brief that the vagueness doctrine does not doubt the constitutionality of laws that call for the application of a qualitative standard to real world conduct because the law is full of instances where a man's fate depends upon his estimating rightly some matter of degree. So in the state's view, it doesn't matter if the statute is, for example, dealing with content on the internet as opposed to what types of anesthesia you should use for a child under the age of eight. That's sort of the same thing. If this question is, what does it mean to ask if my action, if I know that my action is going to cause material detriment to a child, that is a clear enough standard, we would say. That it may be different to ask it in the context of prescribing anesthesia for an eight-year-old versus how I use the child's data. And I want to be very clear to bring back that what the first data use provision, which is where this material detrimental language is, it requires that they know that the use of the data is going to cause harm to the child. So that's very different than asking kind of abstract questions about is it harmful for children to use social media. It's I want to use a child's data this specific way. Do I know or have reason to know, which we give what that standard looks like, which is the sort of you have a basis upon which to conclude that this is true, that this use will cause harm to this child. And if I don't know that, then the law doesn't apply. And if I do know that what I want to do with this data will cause material harm to a child, it seems entirely reasonable to tell companies, please don't do things that you know will cause material harm to children. It's not just a knowledge requirement, right? Is it a negligence requirement? Is it a recklessness requirement? Reason to know. How should we read that? It's reason to know, which Black's Law Dictionary defines, and this is on 18 to 19 of our reply, as a person possessing information from which a person of ordinary intelligence would infer the fact in question exists. So there's no duty of inquiry. It's sort of getting at what I would think that the reason to know gets at the kind of deliberate indifference, the sort of willful blindness, I have the information in front of me, but I'm just not going to read the report that you sent me that says this. Well, or that if any reasonable person had that information, they would. It's so different, though. You can have something that causes sleep loss or hurt feelings or so on, and some families and others, they think it's wonderful. Who's to judge all this? So again, I think that taking a step back, some things are going to be pretty clear. I think everyone would agree that if a child's facing substantial sleep loss, that's detrimental to that child's health and well-being. And the question, again, is not things like hurt feelings. They talk about, you know, they bring up these hypotheticals like a child might post comments on the blog and face bullying. But again, how does that, their companies, if I run a forum, how does my use of that child's data cause bullying? If I don't know that my use of the child's data will cause the child to be exposed to bullying, then it's not within the scope of the statute. The simple fact that a child may use my product and face harm is not what the statute is asking companies to deal with. It's if I use a child's data in a way that I know will cause that child harm, I cannot do that. Or have reason to know. So in the sense that I have information at hand that I should have used to conclude that there would be harm. But I don't have to go investigate. There's no duty of inquiry. I don't have to try and figure out if a child's harmed generally. I just have to ask, do I know or have reason to know that doing this will hurt a child? And it's pretty reasonable to say to companies, please don't do things that you know will hurt a child. Ms. Liska, I guess you've pointed to perhaps there are some analogies in California child welfare laws or anything, but is there like a tort case or anything you could point us to that encapsulates this principle? I presume that there might be instances in some jurisdictions where tort liability might lie against someone who knowingly injured a child or did something materially detrimental to their health. But is there an anchor that we could look to? Did the legislature have something in mind? I think with the materially detrimental to a child's well-being, that's just the plain language of the statute. But I think it has plain common sense meaning. We cite dictionary definitions, I believe, in our opening brief. With respect to the other data use provisions and the dark patterns which deal with the best interest of the child, that is a term of art that I believe the legislature pulled from the family law standard, which asks simply whether or not something is in the child's best interest. And again, I think it's also worth remembering that with respect to the data use provisions, this best interest of the child part comes as part of an exception to the use. Is that ever done wholesale? I mean, as I understand it in family court, it's usually done with a particular child in particular circumstances. How are we supposed to apply that wholesale? So again, I think it's very important that it's coming through in the use of an exception. So the statute itself prohibits certain ways that data is used. Each of the three uses are different in what they prohibit. But they allow it if there is a compelling basis to conclude it's in the child's best interest. So a company is going to be encountering this exception when it wants to do a particular activity that it is otherwise prohibited from doing. So it will be encountering it in the context of, I would guess you could imagine a lot of times very specific cases. But I guess this is enforceable by the state. Is there a private cause of action? No, this is totally enforceable by the state. There's a complainant that comes forward, a parent comes forward, the complaint is filed, the state brings an enforcement action. Is the provider supposed to then put the child on the stand or do discovery to try to figure out whether it was or was not in the complainant's child's best interest? I mean, I think that the question would be if the business had a compelling basis. I believe it's compelling basis or compelling reason to believe it's in the child's best interest. So at the threshold, if it's on the margin, they probably don't have a compelling basis to conclude. And you can think of a lot of examples. For instance, a child has gone missing and the parents want to know their last known location. Or they need to share information on a child's location with authorities because the child has, there's a reason to believe a child's, a specific child is in danger and someone has come to the company and said, we need certain information on this child because they're in danger. And that would be a defense against the entire data collection practice? It would, I mean, the way, I am low on time, but I want to make sure I answer this question. The way that this would work would be that you're generally not allowed to say share data or use data for a purpose other than it was collected, for instance. So I have collected this child's data for purposes of providing some kind of service and I want to use it for another reason or give it to another person. I would then have to ask, is doing that with this particular child's data within the best interest of the child? So it's going to arise in a very fact-specific context rather than a sort of general practices context, which is why, again, I think that the fact that this is within an exception is important here when looking at the statute and determining if the statute as a whole puts a person on notice of what behavior is or isn't allowed. All right. Thank you, counsel. And for your planning purposes, we'll give you a couple of minutes for rebuttal, even though you've used your time. Thank you, Your Honor. Thank you, Your Honors. And may it please the Court, David Gossett for Plaintiff Net Choice. California's Age-Appropriate Design Code Act is a wolf garbed in sheep's clothing. While the State now defends it as a law merely about data management practices, this Court has already noted that it is really about the government instructing companies what content they can show to minors. The law cannot withstand First Amendment scrutiny and Judge Freeman appropriately enjoined it. In so doing, she followed both this Court's instructions from the last time we were here and the mode of analysis the Supreme Court mandated in  As the Court is well aware, we've raised numerous grounds to challenge the preliminary injunction. Given the discussion this morning, I plan, assuming the Court doesn't direct me elsewhere, to focus primarily on two of those, our coverage definition argument and severability, which has not come up yet. On our coverage definition argument, which the Court is obviously quite attuned to, there are a couple of major points that I think are important to flag. The first is that it is a unitary definition. It is not a divisible provision in the way that, for example, the network patterns provision is different from the geolocation data provision. It is six different sort of factors that, six different, to use the statutory term, indicators that the provider or the State can look at to decide if any given service is covered. So I don't think they can be subdivided out. You have to look at all six of those to decide if any given service is, sorry, you obviously are about to ask me a question. I haven't opened my mouth yet. But you were so clearly about to, so I'm going to let you, because I think my point, I made my, that first point. So how do we know? How do we know that the interpretation of the statute is we look at all six holistically. We don't say if you meet one, it counts, or A, it counts. If you meet C, it counts. How do we know that? That that's the interpretation that the California courts would give to this provision. I think several reasons. One, I mean, there's no severability clause, and we'll get to our severability argument, which is different, but there is no severability clause. Right, but this is different than severability. This is how you determine how you mix A through F. Sure. I said severability because I understood Judge Smith's argument, or just a question, Judge Smith doesn't make arguments, to be about whether you could strike one or two of them and therefore defend it. So I'm saying that that's a severability analysis. But the other is, just textually, they are indicators for a unitary decision. The decision is, is, does a service fit into this statutory term likely to be accessed by children? And you decide that based on the following indicators. And it's not an either or list. There is no or after, between E and F. They're all factors that all, that each go to the determination of whether a service is or is not. So to define that, you have to look at the content on the service. That indicator might not push you that way. Let's look at F. Sure. A significant number, a significant amount of the audience, et cetera, et cetera, et cetera. If the answer to that question was yes, wouldn't that mean the answer is that it is likely to be accessed by children? Just taking F separately? No for two reasons. One, you could envision a situation where a significant percentage of the users of a service are children, but it wasn't, still didn't fall within it, if you looked at all the other definitions, that that would be the one factor. There could be a service that is aggressively trying not to be marketed to children, but that it turns out a significant amount, and we don't know if that's 2% or 10% or 20%, actually are children. The second is an argument that we have explained in our brief, that the very term audience in that suggests that the focus of the provision and the whole law is about content providing services. The focus of this law has always been about keeping kids off the Internet, keeping kids from seeing material that the state does not want them to see. We know that 98% of the time children spend on the Internet is on sites that involve presentation of material to those children. It's not about, I mean, people, even if children, some teenagers go on Uber, that's a tiny amount of the time, and it's not the focus here of the law. But Mr. Shostak, doesn't that just present the kind of moody problem more straightforwardly? So a couple things, right? Even if we take your reading of the coverage indicators, it is at least an invitation by plaintiffs in the district court to engage in the kind of facial challenge balancing that's required in terms of identifying, okay, well, what is the scope of the applications of each of these, and is it, you know, substantially over broad, is there a legitimate sweep? Where did any of that happen on remand? I don't think that's the right way of framing this challenge, because, and this is another point I wanted to make for separate reasons, but I will make here, which is that we are not challenging the coverage definition directly. We are challenging the coverage definition because it then imposes the speech-based burdens of the rest of the law on covered services or non-covered services. So to decide if any given, any service is covered by the statute, you have to look at the content on that statute, on that service. Well, but that's not enough under Project Veritas, City of Austin. That no longer can be the trigger for that. Just looking at the content. It has to regulate the content. That's actually, I may have misspoken there, because that's sort of what I was trying to say. This is not at all like Project Veritas, because the substantive rules here involve content-based rules. So if you are subject to this law, then there are a variety of content-based rules that apply to you. Well, but that strikes me as an argument. Right, First Amendment. Right, so to compare this to Project Veritas, Project Veritas says don't record unless, you can basically, for these purposes, you can record if it's a conversation with a police officer. This says you can't do these separate things, which I take to be, your claim is that they're vague and not that themselves are content-based. You can't do these separate things if you're talking with children, if you're in a conversation with children. I don't, because your challenges to the substantive provisions, once we get past the coverage indicators, I take to be setting aside the age estimation requirement. But the data use and dark patterns requirement, your challenges there are vagueness, not free speech. No, we raised free speech challenges to those. The district court ruled against those. But the district court didn't reach them. But we did raise those challenges. But we're not in a position to affirm any invalidation of those on free speech grounds. What's before us is a vagueness challenge. And so I still think maybe there's a world in which we're dealing with free speech questions all the way down and then we have the mother of all Moody analyses in terms of trying to understand exactly what the scope of the application is. But because right now, at least before us, we're dealing with the free speech element is just at that screening stage, either in the coverage. I don't think that's right. So, for example, the same definitional provision also triggers the requirement that a service enforce its terms of service as the state sees that they should. I mean, the state has given up on its challenge to that, but that is similarly triggered by this. More generally, I'm not sure I agree with your characterization of Project Veritas. In Project Veritas, it was still, there was a distinction. The carve out was for open recordings of conversations with police officers. You were still barred from doing closed recordings of conversations with police officers. So there was not a content based distinction because the law still barred some recordings with police officers. It was just sort of a time, place and manner when you could do so, which is very different from saying the burdens apply. But the interlocutor based kind of threshold there is, I mean, that would be problematic under free speech doctrine either way, whether it was happening at the first or the second step with a police officer. I'm not sure I follow. Sorry. Well, I said, I can go back to Project Veritas. Can I, I guess, go to how I would explain how Project Austin, City of Austin applies here and how that is also shows why we're right in this circumstance. I mean, there are two very similar cases. There's City of Austin and Reed, both of which are about restrictions on signs. In City of Austin, you have to glance at the sign to decide are you selling the product on location or off location. But there's nothing about the regulation of the actual sign. In Reed, you were allowed to put up certain kinds of signs with certain contents and not allowed to put up signs with other content. Here, similarly, the law here says if you're covered by this, you must enforce your terms of service. And you have all these other rules that are, again, content-based distinctions. I think it is certainly the case that material detriment is... It is certainly the case that material detriment is... You must enforce your rules. Yeah. Set aside kind of how that works out in practice. Why is that kind of independently? If it just said that all businesses with terms of service in the state of California shall enforce their rules, how is that content-based? Well, our challenge to that, which was our sort of moody analysis that the district court looked at and agreed with, we challenged that with respect to specifically terms of service on the presentation of material and whether or not a service was presenting material that was detrimental, harmful to children. So we limited the challenge, the denominator of the moody analysis, such that it was the application only of the terms of service about the presentation of material to children, not about other things. And within that scope, every application was content-based and a restriction on our First Amendment rights. Where should we look for the district court's moody analysis of that piece, right? I mean, some moody has to come in somewhere, and I think we've heard different accounts that maybe it's happening. We're looking at the entire scope of your challenge. There's other cases that suggest that we should look at it for each provision that you've challenged. But now, so now you've identified, so the terms of service for material, you're bringing a facial challenge to that scope of the terms of service provision as it's covered by the coverage indicators. How does moody work there? How are we supposed to determine whether you win a total facial invalidation of that regime or not? Or is it as applied? No, I think it's clearly a facial challenge. But the Supreme Court has said in, for example, the case about the Washington Public Records Act, is that you can apply, you can undertake the moody analysis or the First Amendment analysis in a facial challenge with respect to the scope that is being challenged. So in that instance, the plaintiff challenged the Washington PRA only as it applied to citizen referendum. And the court therefore undertook the analysis within that scope only, and used that as the denominator and looked at it there. In our case, we very carefully went through this and differentiated our different challenges. So, for example, the information use provision, the dark patterns provision, which as you noted, the court struck down on vagueness grounds. But our First Amendment challenges to those were similarly facial challenges only with respect to the application as to the presentation of content to children. Adam, could you get me the last page of the complaint that has that limit? Oh, it's ER 568. ER 568. Thank you. Thank you, Kristen. So that's the, we defined it that way, and the court looked at it that way. It, at that point, it's- Moody does not require that a First Amendment facial challenge must be analyzed on a provision by provision basis. That's clearly true on one level. I mean, you can't save a statute by adding an entirely unrelated statute to it. So that has to be right on the surface level. But then, so we think that our coverage definition challenge falls in every application because the coverage definition triggers burdens on speech. It triggers burdens, and it triggers burdens differentially based on speech. So it's like the Minnesota Star case, which was a tax on newsprint that only applied to certain speech. Right. I'm with you there. To the extent that we're trying to, any sort of regulation, entirely non-speech-related substantive regulations that are triggered by coverage indicators that are speech-based would be speech-based. What I'm trying to understand is where the district court addressed this kind of all the way down, speech-based all the way down, so that it would impact, setting aside the question of the scope of the coverage, would impact the entire law, even as to coverage indicators that may not be speech-based. I don't, so. Well, I mean, I think she did, because she differentiated in her opinion between the facial challenges to individual provisions and the facial challenges to the coverage definition, which infuses every other application of the act. I do, though, with the courts. I think you're about to go on a severability. I'd prefer to first to hear about how does Paxton, how should we read Paxton as to the age estimation requirement, standing alone? Which Paxton? Sorry. The Supreme Court. It's like there are a lot of moody of net choices. The obscenity. The obscenity. Oh, free speech coalition. They applied intermediate scrutiny to Texas's age estimation requirement. Yes. Okay. So, I think two things I will say about free speech coalition, which is how I've always thought of it, just because they're, just like you can't refer to a case as long time. I think I'll do that now, too. First, the court is clear that heightened scrutiny applies, because it's clearly a restriction on speech. The question before the court was, do you apply strict scrutiny, or do you apply intermediate scrutiny? And the court said it's intermediate scrutiny, because all of the speech that is being precluded under that statute is speech as to which children have no First Amendment rights. The law was entirely targeted on pornography, essentially. Pornography that was obscene as to children. They had no First Amendment right to see it. So, the court said, look, that is clearly a non-First Amendment protected thing, and we have to engage in some balancing, because we know we're going to have to impose burdens on kids, but the state has the right to do this. So, we're lowering the burden. Nothing about the decision, though, as I read it, backs away from the principle in the video games case and elsewhere that if there is some First Amendment right of children to see the speech, then you're in strict scrutiny land. If there's a ban, but yeah, I guess there's a question about whether what the court's doing there is applying the scope of intermediate scrutiny or just applying that intermediate scrutiny applies to the technology of age estimation, and then there's just very weighty interests with respect to that. But I'll let you move on. I think this statute would fall under either of those, in part because, again, when you move away from the aspects of this law that are about restricting speech to minors that the state thinks the minor shouldn't be, the data practices parts that Ms. Litz discussed here, almost all of those were already regulated by the CCPA. So, if you do the Patel analysis of what's new here, it's essentially nothing outside of what the law does to prevent speech and regulate what content kids say. And this, I will flag something that was before the court the first time we were here. In Dr. Rodetsky's declaration, the state's declaration, in the first preliminary injunction motion, she mentions harmful content and keeping kids from harmful content 71 times. Her declaration the second time doesn't use the word content. I mean, the state is trying now to But Judge Freeman has rejected that repeatedly, and I think this court essentially rejected that the first time. But to turn quickly to the severability analysis, because in many ways, it's the easy solution here. I think the state has almost nothing to say in response to it, and notably said very little in their briefs about it. As enacted, the statute was a regulatory and compliance-focused regime. It had a notice and cure provision. It required companies to ex ante look at their practices and think this through so that they would not fall afoul of the rules. It followed from the UK's version that, similarly, is completely a compliance-based regime. It doesn't even have the force of law. This court's already said that compliance regime, the way it was So removing that makes this into a gotcha law. It makes it into a gotcha law where it is now entirely up to Attorney General Bonta what practices are unlawful when he's going to bring the burden of the state down on any given company in the state. But beyond that, that goes to why it's perfectly reasonable to think that it's not felicitously severable. But the other thing is, we know precisely that it is not from the statutory history of its enactment. This law was before the California legislature over the course of a six-month period. Repeatedly, the initial version of the law did not have a notice and cure provision. People objected to the law on that basis. This is ER 343 and 344. People specifically asked that the law be clarified that the Attorney General could enforce it, there was no private right of action, and that there be a notice and cure provision. In response to that, Assemblymember Wicks added the AG provision and the no private right of action provision, but didn't add a notice and cure provision. That's in June. In August, still the law does not have that. The law is sent to the suspension file where legislation goes to die. The law comes out of that. Someone brings it out, presumably because Assemblymember Wicks really wants this law to pass, and she adds in a 45-day notice and cure provision. That still isn't enough. Alitoso, why don't you conclude, please? Okay. Sorry. Still isn't enough, and it's only when she adds in a 90-day notice and cure provision that the law, in fact, is enacted and passed by the legislature. So we know here, and the State hasn't met its burden here, because the burden is on them, that they wouldn't, that the law wouldn't have passed without the notice and cure provision. Thank you, counsel. Thank you very much, Your Honor. We'll give you two minutes for rebuttal. Who are you giving two minutes for rebuttal to? To the State. Oh, got it. Okay. I thought you were just giving it to the counsel who just argued. No, to me. That's all right. Two quick points I'd like to make, and then one slightly longer one if I have enough time. The first is, with respect to this question about how to do the Moody analysis with the definitional provision, I think the question becomes, what are we saying is subject to the proper level of scrutiny? So if the argument is that the substantive regulations are subject to strict scrutiny, which is what the lower court said happens here, then the question becomes, do the substantive regulations meet strict scrutiny that requires the analysis of what's the compelling interest, the least restrictive means test? That's going to have to look at the Moody analysis of that question. So what are the applications of the substantive regulations? Which applications meet strict scrutiny? Which applications don't? Because it's the substantive regulations we say are subject to it. Second quick point on this age estimation question and Paxton. I think the salience of Paxton is, what level of review applies to age estimation depends upon what age estimation is asking you to do as an alternative. Estimate age or X. And here it's estimate age or apply the act's substantive regulations, some of which this court indicated in its prior ruling do not regulate speech at all on their face. So we would say the remedy is to challenge the regulations that are violating the First Amendment. The age estimation provision is a conduct regulation that stands alone. And finally, on this question about the definitional indicator, we agree that to the extent that children are using the app in significant numbers or using a product that it meets the definition. And it might be helpful to briefly point the court to considering a brick and mortar analogy. You can imagine a law that regulates businesses, physical businesses children are likely to access that use the exact same definition here. It's clearly going to catch within its scope businesses that may make choices about design elements or advertisements, but the service they provide to children has nothing to do with expression. And it'll catch businesses that do have expression like putting on movies or plays for children. But we're regulating them because children are in the space, not because of what they want to say to the children. Thank you, Your Honors. All right, we thank counsel for their argument. The case just argued is submitted. And with that, we are adjourned.
judges: SMITH, BENNETT, JOHNSTONE